STATE OF WEST VIRGINIA *v.* NOAH McCALLISTER

(No. 7044)

Submitted January 19, 1932.    Decided January 26, 1932.

*C. E. Copen,* for plaintiff in error.

*Howard B. Lee,* Attorney General, and *W. Elliott Nefflen,* Assistant Attorney General, for the State.

LIVELY, JUDGE:

Noah McCallister, sentenced to two and one-half years' confinement in the penitentiary upon conviction of unlawful shooting and wounding, prosecutes error, charging that the evidence does not warrant the verdict.

The altercation occurred along the paved highway between Winfield and Pliny in Putnam county. McCallister was walking towards Pliny and met Orris Jordan, the prosecuting witness, who was driving his car in the opposite direction. Jordan stated that McCallister motioned for him to stop; he did so and asked McCallister, who had been doing some farm work for him, if he intended to work that day, whereupon McCallister, answering in the negative, accused Jordan of telling ''lies'' on him. Jordan left his car and struck McCallister several blows with his fist until the latter requested Jordan to quit; and he did so. Jordan, after admonishing McCallister, who already was walking towards Pliny, to ''be careful who you call a liar from now on,'' returned to his car. (One witness testified that Jordan told defendant if he called him a liar again, ''Ill beat the head off of you.'')

According to McCallister, Jordan laughed and swore at him in vile terms. Jordan relates that, as he was about to enter his car, he heard McCallister make an inaudible remark, that he requested a repetition, that McCallister said ''I'll settle with you latter,'' to which he replied, ''You had better come and settle it now.'' About this time, McCallister, who had walked to a point about 100 feet (some witnesses say 60 to 75 feet) from Jordan's car, displayed his revolver. There is a dispute as to whether McCallister shot before Jordan stooped for the apparent purpose of picking up a gravel, or whether, as McCallister puts it, Jordan stooped and ''I fired two shots at his hand.'' In all, five shots were fired. After each of the first three shots, Jordan advanced toward McCallister, who had stationed himself at the berm of the road. Just before Jordan reached McCallister, who had already fired three shots, a bullet struck Jordan's side. Jordan then struck McCallister with his fist, grabbed his right hand, and attempted to get the gun from McCallister who, holding it with both hands, fired again, and again the bullet struck Jordan below the stomach. Wounded, Jordan grabbed McCallister, and the latter, jerking Jordan over the edge of the road, became entangled in a wire fence which caused him to fall and thus to release Jordan.

McCallister says he warned Jordan as the latter advanced that one of them would be injured if Jordan continued to come towards him. This Jordan denies. McCallister further states, and Jordan denies, that Jordan had a knife in his hands; that he (McCallister) "saw he was trying to use it," and that Jordan said, "I will kill you." As contradictory of Jordan's version, McCallister states that he shoved Jordan from him and that instead of jerking Jordan with him over the edge of the road, Jordan followed him to the fence. McCallister had no license to carry his gun but explained there "were two men that threatened" him. The state adduced evidence to the effect that prior to the shooting, McCallister had said that Jordan "had been telling certain things on him and that he, McCallister, was going to get him for it."

It is the contention of the defense that Jordan was the aggressor, that McCallister was without fault, and that he shot in self-defense. The determination of who was the aggressor becomes subordinated to the controlling issue of McCallister's justification for shooting. Assuming, without deciding, that McCallister was not the aggressor, the rule has been well settled in this jurisdiction since *State* v. *Cain*, 20 W. Va. 679 (1882), that when one without fault is attacked by another in such a manner or under such circumstances as to furnish reasonable grounds for apprehending a design to take away his life or to do him some great bodily harm, and there is reasonable ground for believing the danger imminent that such design will be accomplished, and the person assulted has reasonable ground to believe and does believe such danger is imminent, he may act upon such appearances and without retreating, kill his assilant, if he has reasonable grounds to believe, and does believe, that such killing is necessary in order to avoid the apprent danger; and the killing under such circumstances is excusable, although it may afterwards turn out, that the appearances were false, and that there was in fact neither design to do him some serious injury nor danger, that it would be done. But of all this the jury must judge from all the evidence and circumstances of the case. As to the imminency of the danger, which threatened the prisoner, and the necessity of the killing in

the first instance the prisoner is the judge; but he acts at his peril, as the jury must pass upon his action in the premises, viewing said actions from the prisoner's standpoint at the time of the killing. The same rule prevails where there is an unlawful shooting and wounding.

The jury's verdict negatives the imminency of danger, and we see no reason to disturb its finding. It has chosen to accept Jordan's version of the affray supplemented by several eye witnesses. Hence, on a motion to set aside a verdict of the jury on the ground that it is contrary to the evidence, this court will disregard testimony in conflict with the finding of fact by the jury. What was that imminency of danger to justify this shooting? McCallister gives as his reason for shooting Jordan that he "had heard his (Jordan's) reputation and I was afraid of him," that he was a dangerous man, and that he saw a knife in Jordan's hand. There is no evidence to show what Jordan's reputation was. Were it that of a bully or had there been experiences on which defendant might base his bare conclusion, may we not presume that the defense would have so shown? If there were great difference in the weight or strength of the participants, the record does not disclose it; and the jury saw for itself. While Jordan's courage in advancing toward McCallister, armed with a dangerous weapon being fired, may by the prudent person be considered as foolhardy, we do not believe his temerity alone stamps him as a dangerous man. Can it be said by this Court that McCallister sensed danger by reason of the knife in Jordan's hand? Jordan denied that he displayed a knife; none of the witnesses who watched the fight saw any evidence of it; and the jury discredited defendant's story. Upon what then could defendant base his belief that there was imminency of danger? Not on the ground that Jordan was hitting him, because the first wounding had already occurred when Jordan struck him; and not because of any rocks, because McCallister testified that Jordan "threw whatever he had in his hand" before he fired the third shot. We cannot say that because the prosecuting witness had struck McCallister several blows a few minutes before the wounding that McCallister had a right to believe himself in a postion where

he need have fear for his life or where some great bodily harm might be done him. To warrant shooting and wounding it is necessary that *great* bodily harm, more than a mere fist assault, be apparent to the assailed. *State* v. *Cain, supra.* Defendant himself says that in the first fistic affray Jordan stopped striking him when he (McCallister) asked him to do so; why, then, may we not assume that Jordan would do likewise again? Again, we ask, why did McCallister shoot Jordan? Upon what evidence could the jury have based a contrary verdict? The record does not answer the quaere. Then, shall we, as an appellate court, resort to the realm of make-believe and conjure up reasons to invade the province of a jury in order to give credence to a defendant who unlawfully carried a dangerous weapon and used it before necessity demanded its use? We have adhered to the guidance of that eminent jurist, Judge Brannon, whose wisdom we again quote from *State* v. *Bowyer,* 43 W. Va. 180, 27 S. E. 301: "It is not worth while to cite authority for the proposition that, where there is evidence tending to criminate, the jury is almost uncontrollably the judge of its force and weight, and of the proper inferences from the facts proven. But this was not all the evidence. The witnesses were face to face before the judge and jury. The prisoner was before them. They saw him in the ordeal of examination. They scrutinized his countenance, his demeanor, his words, his tone. They were to judge of his veracity. They discredited his denial of guilt. They saw and heard all of the witnesses, all the circumstances of the trial,—often silent, but potential, evidence of the real truth. That judge and those jurors would average with us, had we been present in capacity to judge of evidence; and as we have nothing of the actual appearance of the trial, and only the evidence in cold type, they are vastly more competent than we to pass safe judgmment upon the facts. We are not a jury. We have power—mere power —to discredit verdicts; but we must be cautious in so doing. Why have juries if appellate judges are to go into the business of weighing evidence as if by the ounce and pound? We ought not to do this. It is an abuse of power, and a misconception of our functions and of the jury function. The jury

institution is sacred under our constitution, and a verdict is to be highly respected. In long experience, I must say that, as a general thing, they evince good sense and do justice. From the frequency of requests to us to set aside verdicts, it seems to be thought that we can and will do so merely because we would not have found, judging from type, the same verdict; but such is not the rule, though instances deviating from these principles may be found, and I am very much averse to looseness in this matter on the part of appellate courts. And then, too, we must not forget that a learned and experienced judge approved the verdict, after witnessing the trial; and his opinion is entitled to great respect in an appellate court. *State* v. *Hunter*, 37 W. Va. 744, 17 S. E. 307. We must be careful lest we set ourselves up as judge and jury present at the trial, and usurp their functions.''

It is true, as is sometimes charged, that juries err in their verdicts; and where it clearly appears that the verdict is erroneous or manifestly against the weight of the evidence, the appellate court will reverse the jury's finding. Such is not the instant case.

The judgment of the court below is affirmed.

*Affirmed.*

MAXWELL, JR., dissenting:

Doubtless the defendant was guilty of unlawfully carrying a revolver, and it seems probable that he falsified at the trial when he testified that the prosecuting witness had a knife in his hand at the time of the affray. But these considerations should not have deprived the defendant of the right of self-defense. He was not the aggressor in either the preliminary affair at the automobile or the more serious subsequent affair. On the other hand, in both instances, the prosecuting witness demonstrated his eager desire for personal combat. At the automobile the prosecuting witness held the defendant with his left hand and beat him about the head with his right fist when the defendant had not made the slightest move toward attempting violence on the prosecuting witness. Then, after the defendant had started away, going about his own affairs, the prosecuting witness launched another attack upon the

defendant merely because the defendant, as he was departing, said to the prosecuting witness, according to the latter's own version," 'I'll settle with you latter' or something similar to that."

When the prosecuting witness started toward the defendant in bellicose attitude, the defendant undoubtedly had the right to appraise the situation in the light of the circumstances. The prosecuting witness had already beaten him; two shots (one fired low and the other high) had failed to halt the prosecuting witness in his onslaught. In those circumstances, surely the defendant had ample justification for believing that he was in danger of great bodily harm at the hands of his assailant. For this reason, I conclude that the defendant is being punished as a felon for exercising his simple right of self-defense.

But it is said that this is a jury question. It is, primarily. But sometimes juries make mistakes as do judges now and then. Jury verdicts are not panaceas for all ills, nor shields for injustice. I think that this man's guilt is not established beyond reasonable doubt, and that the jury was unwarranted in its finding; therefore I would set aside the verdict, reverse the judgment, and award a new trial.

Judge Litz authorizes me to say that he joins in this dissent.